## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No. 19-cv-01850-NYW

JONATHAN SANDERS, *individually*,[1]

      Plaintiff,

v.

GLENDALE RESTAURANT CONCEPTS, LP,

      Defendant.

---

## MEMORANDUM OPINION AND ORDER

Magistrate Judge Nina Y. Wang

      This matter comes before the court on the Motion for Summary Judgment ( or "Motion") filed by Defendant Glendale Restaurant Concepts, LP ("Defendant" or "Glendale"). [#46; #47, filed May 26, 2020]. Pursuant to the Order of Reference dated November 5, 2019 [#30], this civil action was assigned to the undersigned Magistrate Judge for all purposes. *See* 28 U.S.C. § 636(c); Fed. R. Civ. P. 73; D.C.COLO.LCivR 72.2. Plaintiff Jonathan Sanders ("Plaintiff" or "Mr. Sanders") has responded to both the Motion and the associated Statement of Undisputed Facts [#49; #50; #51] and Defendant has replied [#54; #55; #56]. This court finds that oral argument will not materially assist in the disposition of the instant Motion. Being fully advised of the premises, this court respectfully **GRANTS** Defendant's Motion for Summary Judgment.

---

[1] Originally, Plaintiff Jonathan Sanders ("Plaintiff" or "Mr. Sanders") filed this action on behalf of himself and others similarly situated. The Parties filed a Stipulation regarding conditional certification to proceed as a collective action under the Fair Labor Standards Act ("FLSA"), and the court ultimately approved an FLSA collective. [#33, #35, #36]. No other individuals opted in to the collective and thus, Mr. Sanders now proceeds individually.

# BACKGROUND

On June 26, 2019, Mr. Sanders initiated this action against Glendale, Mile High Valet, LLP ("Mile High Valet"), and Jimmie Hamilton ("Mr. Hamilton"), the operator of Mile High Valet. [#1]. He alleged that he performed valet services at adult entertainment clubs including PT's Show Club ("PTSC") and Mile High Men's Club ("MHMC" and collectively with Glendale, "the Clubs"),[2] from approximately December 2016 through October 2018 in Denver, Colorado. [*Id.* at ¶¶ 7, 8]. Mr. Sanders contends that during that time he was misclassified by Defendant as "exempt" from the overtime requirements of the FLSA and routinely denied any wages at all for hours worked, despite working approximately forty hours each workweek and oftentimes more than forty hours each week. *See generally* [*id.*]. Plaintiff alleges that Defendant "set the rules and had complete control over the venue where Plaintiff worked," and "provided the tools needed to provide valet services, including but not limited to communication devices and a valet podium." [*Id.* at ¶¶ 31, 32]. Plaintiff "had to follow Defendant['s] rules or risk loss of some or all of his tips." [*Id.* at ¶ 33].

After learning that Mile High Valet and Mr. Hamilton had separately filed for bankruptcy [#24], Plaintiff amended his Complaint, leaving Glendale as the only defendant. [#25]. In the operative Amended Complaint, Mr. Sanders asserts an individual claim for violation of the FLSA for failure to pay minimum wage and failure to pay one and a half of his regular wage for all hours

---

[2] In the instant Motion, Defendant states that Glendale owns MHMC and Denver Restaurant Concepts, LLC ("DRC") owns PTSC. [#46 at 1]. Plaintiff avers in his Response that "this information was not disclosed . . . prior to Defendant's Motion for Summary Judgment, Plaintiff has no actual knowledge of Defendant's corporate structure, and Defendant admitted that it operates various clubs under different trade names and has otherwise not denied operating [PTSC]." [#49 at 5 n.1]. Defendant notes that DRC is not a named defendant in the instant action and argues that "[e]ven if DRC was named, any potential claims against it would fail for the same reasons as they fail against Glendale." [#46 at n.2]. For clarity, and because both Parties refer to PTSC and MHMC collectively as "the Clubs", the court adopts the same terminology.

worked beyond forty (40) hours per week.  [#25].  As noted above, Mr. Sanders also asserted a second, collective action claim that is no longer at issue.  *See supra* n.1.

The Parties proceeded through discovery and, on May 26, 2020, Glendale filed the instant Motion for Summary Judgment.  *See* [#46].  In moving for summary judgment in its favor, Glendale contends that it is not a joint employer for the purposes of the FLSA.  [*Id.*].  Mr. Sanders disagrees, arguing that regardless of the formal arrangements, there is at least a genuine issue of material fact that Glendale exercised the type of control and oversight of his employment to constitute an employer under the FLSA.  [#49].

## LEGAL STANDARDS

### I.   Summary Judgment

Summary judgment is appropriate only if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Henderson v. Inter–Chem Coal Co., Inc.*, 41 F.3d 567, 569 (10th Cir. 1994).  "A 'judge's function' at summary judgment is not 'to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial.'"  *Tolan v. Cotton*, 134 S.Ct. 1861, 1866 (2014) (quoting *Anderson v. Liberty Lobby,* 477 U.S. 242, 249 (1986)).  Whether there is a genuine dispute as to a material fact depends upon whether the evidence presents a sufficient disagreement to require submission to a jury or, conversely, is so one-sided that one party must prevail as a matter of law.  *Anderson,* 477 U.S. at 248–49.  *See also Stone v. Autoliv ASP, Inc.,* 210 F.3d 1132, 1136 (10th Cir. 2000); *Carey v. U.S. Postal Serv.,* 812 F.2d 621, 623 (10th Cir. 1987).  A fact is "material" if it pertains to an element of a claim or defense; a factual dispute is "genuine" if the evidence is so contradictory that if the matter went to trial, a reasonable party could return a verdict for either party.

477 U.S. at 248. "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citing *First Nat. Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 289 (1968)).

In reviewing a motion for summary judgment, the court views all evidence in the light most favorable to the non-moving party. *See Garrett v. Hewlett-Packard Co.,* 305 F.3d 1210, 1213 (10th Cir. 2002). However, the nonmovant "may not rest upon mere allegation or denials of [the] pleadings, but must set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 256. Conclusory statements based merely on speculation, conjecture, or subjective belief are not competent summary judgment evidence. *See Bones v. Honeywell Int'l, Inc.,* 366 F.3d 869, 875 (10th Cir. 2004). The nonmoving party's evidence must be more than "mere reargument of [its] case or a denial of an opponent's allegation" or it will be disregarded. *See* 10B Charles Alan Wright, et al., Federal Practice and Procedure § 2738 at 356 (3d ed. 1998). Ultimately, however, the court may not enter summary judgment unless Defendant carries its burden under Rule 56 of the Federal Rules of Civil Procedure. *See Reed v. Bennett*, 312 F.3d 1190, 1194-95 (10th Cir. 2002). *See also* Fed. R. Civ. P. 56(a).[3]

---

[3] The court notes that this action is set for a bench trial. *See* [#52]. When a case is set to be tried to the bench rather than to a jury, some circuits allow their district courts to make factual findings at the summary judgment phase if the court can confidently say that presentation of live evidence would make no difference. *See Citizen Awareness Proj. Inc. v. Internal Revenue Serv.*, No. 13–cv–2127–WJM–NYW, 2015 WL 2155723, at *1 n.1 (D. Colo. May 6, 2015) (collecting cases). Other circuits hold that the summary judgment standard remains the same regardless. *See id.* (collecting cases). The Tenth Circuit has never addressed this question directly, but it appears to lean in favor of the latter view in at least some contexts. *See id.* (citing *Jacobsen v. Deseret Book Co.,* 287 F.3d 936, 949 (10th Cir. 2002) ("Although a district court can make factual findings related to laches after a bench trial, the court should not make factual findings when addressing a summary judgment motion based on laches . . . .")). This court therefore focuses upon whether there is a genuine issue of material fact that precludes summary judgment, and resolves factual ambiguities in favor of Plaintiff as the non-moving party.

## II.      FLSA

The FLSA governs the payment of minimum wages and overtime compensation between an employer and its employees.  *See* 29 U.S.C. §§ 206–207.  Under the FLSA, a covered employer must pay its employees for the time that it employs them; and the FLSA generally requires covered employers to compensate employees for work in excess of forty hours in a workweek.  *See* 29 U.S.C. §§ 206(a), 207(a).  The required overtime compensation is one and one-half times an employee's "regular rate" of pay.  29 U.S.C. § 207(e).  The FLSA defines an "employer" as "any person acting directly or indirectly in the interest of an employer in relation to an employee."  29 U.S.C. § 203(d).  The FLSA "defines the verb 'employ' expansively to mean 'suffer or permit to work.'"  *Nationwide Mut. Ins. Co. v. Darden,* 503 U.S. 318, 326 (1992) (quoting 29 U.S.C. § 203(g)).  Separate entities that share control over an individual worker may be deemed "joint employers" under the FLSA.  *See* 29 C.F.R. § 791.2(a).  "If the facts establish that the employee is employed jointly by two or more employers…all joint employers are responsible, both individually and jointly, for compliance with all of the applicable provisions of the act, including the overtime provisions…"  *Id.*  In promulgating amendments to 29 C.F.R. § 791.2, directed at determining joint employer status under the FLSA, the U.S. Department of Labor ("DOL") noted that

> [u]ntil this final rule, the Department had not meaningfully revised part 791 since its promulgation over 60 years ago. . . .The Department is concerned that part 791 does not provide adequate guidance for the most common joint employer scenario under the Act—where an employer suffers, permits, or otherwise employs an employee to work, and another person simultaneously benefits from that work.

*See* Joint Employer Status Under the Fair Labor Standards Act, 85 Fed. Reg. 2820-01 (Jan. 16, 2020).[4] The DOL further observed that "Part 791's focus on the association or relationship between

---

[4] Congress tasked the U.S. Department of Labor ("DOL") with interpreting the terms of the FLSA and issuing regulations thereunder.  *See generally* 29 U.S.C. § 204 (creating the DOL's Wage and

potential joint employers is not necessarily helpful in determining whether the other person benefitting from the employee's work is the employee's employer too, especially considering the text of section 3(d) and Supreme Court and circuit court precedent determining joint employer status based on the degree of control exercised by the potential joint employer over the employee." *See id.* To that end, in the scenario where the employee has an employer who suffers, permits, or otherwise employs the employee to work, *see* 29 U.S.C. 203(e)(1), (g), but another person simultaneously benefits from that work, the DOL adopted the following four factors whether the other person:

> (i) Hires or fires the employee;
> (ii) Supervises and controls the employee's work schedule or conditions of employment to a substantial degree;
> (iii) Determines the employee's rate and method of payment; and
> (iv) Maintains the employee's employment records.

29 C.F.R. § 791.2(a)(1)(i)-(iv).

Whether an entity is an employer within the meaning of the FLSA is a legal question, with subsidiary findings considered issues of fact. *Mason v. Fantasy, LLC*, No. 13–cv–02020–RM–KLM, 2015 WL 4512327, at *9 (D. Colo. July 27, 2015) (citing *Patel v. Wargo*, 803 F.2d 632, 634 (11th Cir. 1986)). The Tenth Circuit has not yet articulated a test for determining whether two entities are joint employers under the FLSA. *See Knerr v. Boulder BJ, LLC,* No. 19–cv–00799–JLK–MEH, 2020 WL 5126138, at *4 (D. Colo. Apr. 7, 2020). However, the Tenth Circuit has adopted the "economic realities" test in analogous situations to determine whether a particular defendant acted as an "employer" as defined by the FLSA. *See Baker v. Flint Eng'g & Const. Co.*,

---

Hour Division to administer the substantive provisions of the FLSA). *See also Josendis v. Wall to Wall Residence Repairs, Inc.,* 662 F.3d 1292, 1299 n.8 (11th Cir. 2011). The court may defer to regulations such as these when the statutory language is ambiguous or the statutory terms are undefined. *Chevron U.S.A. Inc. v. Nat. Res. Def. Council,* 467 U.S. 837, 843–45 (1984).

137 F.3d 1436, 1440 (10th Cir. 1998) (applying the economic realities test to determine whether plaintiffs were employees or independent contractors); *Henderson v. Inter–Chem Coal Co., Inc.*, 41 F.3d 567, 570 (10th Cir. 1994) (same). District courts within the Tenth Circuit, including within the District of Colorado, have applied the economic realities test at both the motion to dismiss and summary judgment phases to consider whether two entities qualify as "joint employers." *See Beltran v. InterExchange, Inc.*, 176 F. Supp. 3d 1066, 1079 & n.15 (D. Colo. 2016); *Sanchez v. Simply Right, Inc.*, No. 15–cv–00974–RM–MEH, 2017 WL 749071, at *8–10 (D. Colo. Feb. 27, 2017), *report and recommendation adopted in part, rejected in part*, No. 15–cv–00974–RM–MEH, 2017 WL 2222601 (D. Colo. May 22, 2017). *See also Harbert v. Healthcare Servs. Group, Inc.*, 173 F. Supp. 2d 1101, 1105 (D. Colo. 2001) (applying the FLSA economic realities test in the FMLA context to conclude that fact question existed as to whether employee was jointly employed by housekeeping service and nursing home) (citing *Goldberg v. Whitaker,* 366 U.S. 28, 33 (1961)); *Zachary*, 471 F. Supp. 2d at 1179. Under the economic realities test, "the inquiry is not limited to traditional common law concepts of employee . . . or contractual terminology." *Harbert*, 173 F. Supp. 2d at 1105 (quoting *Henderson,* 41 F.3d at 570) (internal quotations omitted)). The factors that comprise the economic realities test change according to the circumstances of the inquiry. *See id.* ("[T]he Court must simply 'focus upon the circumstances of the whole activity and the economic reality of the relationship.'") (quoting *Szymula v. Ash Grove Cement Co.,* 941 F. Supp. 1032, 1036 (D. Kan. 1996))).

Since 2018, however, some courts in this District have favored the test set forth by the Fourth Circuit in *Hall v. DIRECTV, LLC,* 846 F.3d 757 (4th Cir. 2017) and *Salinas v. Commercial Interiors, Inc.*, 848 F.3d 125, 132 (4th Cir. 2017). *See Merrill v. Pathway Leasing LLC*, No. 16–cv–02242–KLM, 2018 WL 2214471, at *3 (D. Colo. May 14, 2018); *Sanchez v. Simply Right,*

*Inc.*, No. 15–cv–00974–RM–MEH, 2017 WL 2222601, at *6 (D. Colo. May 22, 2017).  The *Hall–Salinas* test determines whether more than one person or entity are putative joint employers based on the relationship between them, and the relationship between the putative employee and the putative employers is addressed as a distinct, separate inquiry, unlike the economic realities test which combines these inquiries.  *Merrill*, 2018 WL 2214471 at *6.  The factors a court considers under the *Hall-Salinas* test are:

> (1) Whether, formally or as a matter of practice, the putative joint employers jointly determine, share, or allocate the ability to direct, control, or supervise the worker, whether by direct or indirect means;
>
> (2) Whether, formally or as a matter of practice, the putative joint employers jointly determine, share, or allocate the power to—directly or indirectly—hire or fire the worker or modify the terms and conditions of the worker's employment;
>
> (3) The degree of permanency and duration of the relationship between the putative joint employers;
>
> (4) Whether through shared management or a direct or indirect ownership interest, one putative joint employer controls, is controlled by, or is under common control with the other putative joint employer;
>
> (5) Whether the work is performed on premises owned or controlled by one or more of the putative joint employers, independently or in connection with one another; and
>
> (6) Whether, formally or as a matter of practice, the putative joint employers jointly determine, share, or allocate responsibility over the functions ordinarily carried out by an employer, such as handling payroll; providing workers' compensation insurance; paying payroll taxes; or providing the facilities, equipment, tools, or materials necessary to complete the work.

*Merrill*, 2018 WL 2214471, at *3–4 (citing *Hall*, 846 F.3d at 769–70)).

The Parties here both argue under the "economic realities" test.  Specifically, the Parties agree that four factors of the economic realities test should govern: (1) whether the employer had the power to hire and fire the employee; (2) whether the employer supervised or controlled the employee's work schedule or conditions of employment; (3) whether the employer determined the

rate and method of payment of the employee's wages; and (4) whether the employer maintained any employment records.  [#46 at 4 (citing *Baker v. Flint Eng'g & Const. Co.,* 137 F.3d 1436, 1440 (10th Cir. 1998)); #49 at 4 (citing *Schindler v. Whiting Petroleum Corp.,* No. 17–cv–1051–WJM–NYW, 2017 WL 5969814, at \*3 (D. Colo. Dec. 1, 2017)].  Though this court has the highest regard for the courts in this District that have departed from the economic realities test, in light of the Tenth Circuit's recognition that one of the primary purposes of the FLSA is "the maintenance of the minimum standard of living necessary for health, efficiency, and general well-being of workers," 29 U.S.C. § 202 (West); *see also Kenney v. Helix TCS, Inc.*, 939 F.3d 1106, 1111 (10th Cir. 2019) (citing the same), the recent amendment to 29 C.F.R. § 791.2, and the Parties' agreement, I apply the four-factor economic realities test delineated above in this instant action.[5]

## UNDISPUTED MATERIAL FACTS

The following undisputed material facts are drawn from the record before the court.  In some instances, a party has disputed the proffered material fact, but an examination of the record finds that such dispute is not properly supported by evidence in the record.  Where that is the case, the court has noted the dispute and its analysis.

1.      Mile High Valet entered into Valet Parking Agreements with Glendale to provide valet parking services at PTSC and MHMC.  [#47-1].[6]

---

[5] This court notes that the DOL regulation rejects the notion that whether an employee is economically dependent on the potential joint employer as relevant to determining the potential joint employer's liability under the FLSA.  29 C.F.R.  791.2(c).  But the Parties to this action do not ask this court to assess other factors sometimes identified as part of the economic realities test that run counter to the regulation, such as the degree of skill required to perform the work or the extent to which the work is an integral part of the alleged employer's business.  *Compare Coldwell v. Ritecorp Envtl. Prop. Sols.*, No. 16–cv–01998–NYW, 2017 WL 1737715, at \*5 (D. Colo. May 4, 2017) *with* 29 C.F.R. § 791.2(c) (disregarding whether employee is in a specialty job or a job that otherwise requires special skill, initiative, judgment, or foresight).

[6] Though Plaintiff objects and states that he cannot admit or deny that Glendale entered into Valet Parking Agreements with Mile High Valet [#50 at 2 ¶ 3], the objection does not make this fact

2.     The Agreements state that the valet drivers "are employees of [Mile High Valet] and not employees of [the Clubs]" and "[Mile High Valet] will not hold itself out as an express, implied, and/or apparent agent of [the Clubs] to any third party and [Mile High Valet] shall use reasonable efforts to disaffirm any such belief by a third party." [#47 at 3 ¶ 7; #47-1 at ¶ 4; #51 at 3-5 ¶ 7].

3.     As part of the Valet Parking Agreements, Mile High Valet agreed that its valet drivers "shall act in accordance with all [the Clubs'] policies" and the Clubs "reserve[] the right to request that any [valet driver] provided by [Mile High Valet] who fails to comply with [the Clubs'] standards and expectations be removed and [Mile High Valet] agrees to remove said [valet driver] upon request of [the Clubs]."  [#47 at 2 ¶ 4; #47-1 at ¶ 2; #47-2 at ¶ 4; #50 at 2-3 ¶ 4].

4.     One such Clubs policy required valets to wear valet shirts; Mr. Hamilton provided valet shirts to Mile High Valet drivers at no cost.[7]  [#47 at 3 ¶ 5; #47-2 at ¶ 5; #47-3 at ¶ 4; #47-4 at 46:18–47:10].

---

properly disputed.  At summary judgment, the non-movant must come forward with specific facts, supported by admissible evidence, to demonstrate a disputed material fact and cannot simply rely on denials. Fed. R. Civ. P. 56(e) ("If a party fails . . . to properly address another party's assertion of fact as required by Rule 56(c), the court may: . . . consider the fact undisputed for the purposes of the motion.").   Conclusory statements or those based on speculation, conjecture, or surmise provide no probative value on summary judgment, *see Nichols v. Hurley*, 921 F.2d 1101, 1113 (10th Cir. 1990); nor may the nonmovant rely on "mere reargument of his case or a denial of an opponent's allegation," *see* 10B Charles Alan Wright, et al., Federal Practice and Procedure § 2738 at 356 (3d ed. 1998).

[7] Plaintiff denies that Mr. Hamilton provided valet shirts to Plaintiff at no cost because "Plaintiff paid [Mr.] Hamilton $50 to $75 each shift." *See* [#51 at 3 ¶ 5].  This contention, however, is belied by Plaintiff's deposition testimony.  *See* [#47-4 at 47:7-10 (Q: "Who gave you the shirt?" A: "Jimmie [Hamilton]." Q: "Did you have to pay for it?" A: "I don't think so, no."); *id.* at 93:22-23 (Q: "Who paid for that uniform?" A: "I have no idea.").  *See Allen v. Lang*, 736 Fed. Appx. 934, 940 n.3 (10th Cir. 2019) (rejecting the plaintiff's version of events on summary judgment that contradicted the plaintiff's deposition testimony).  Further, the cost of the shirt is ultimately not material to the question of whether Defendant constitutes Plaintiff's employer under the FLSA because no one contends that Defendant charged Plaintiff for the shirt.

5.      If the Clubs exercised their ability to request removal of non-compliant valet drivers from Club premises, the non-compliant Mile High Valet drivers could continue working at other locations; in other words, request for removal by the Clubs did not prevent valet drivers from working at other locations serviced by Mile High Valet. [#47 at 3 ¶ 6; #47-2 at ¶ 4; #47-3 at ¶ 5; #51 at 3 ¶ 6].[8]

6.      In December 2016, Mr. Sanders wanted a second job to help pay for his child support and a friend referred him to Mr. Hamilton, the owner and operator of Mile High Valet. [#47 at ¶¶ 10-11; #50 at ¶¶ 10-11; #47-4 at 26:14-16, 27:10-12, 29:14-15;[9] #47-3 at 1 ¶ 1].

7.      Mr. Sanders contacted Mr. Hamilton via telephone; Mr. Hamilton invited him to meet at PTSC's valet shack to "get a feel for the job." [#47 at 4 ¶ 12; #51 at 6 ¶ 12].

8.      Mr. Sanders met Mr. Hamilton at the PTSC valet shack to observe the valet drivers working and to discuss the job duties of a valet driver position with Mr. Hamilton.  [#47 at 5 ¶ 13; #51 at 6 ¶ 13].

9.      At this meeting, Plaintiff and Mr. Hamilton discussed the financial arrangement of the valet driver position; Plaintiff was to keep any tips earned from customers and pay Mr. Hamilton nightly "quotas" every night Plaintiff worked, ranging from $50 on weeknights to $75

---

[8] Plaintiff argues that Defendant's "averments about the contractual relationship between Defendant and Mile High Valet are immaterial to Defendant's Motion and are therefore denied." [#51 at 3 ¶ 6].  However, for the same reasons discussed above, *supra* n.6, Plaintiff's assertion that a fact is immaterial does not create a dispute of fact.  Though the contractual relationship between the Clubs and Mile High Valet may not be *per se* relevant because Plaintiff does not seek to establish joint employer status through the relationship of the putative joint employers, it is material what control the Clubs were contractually allocated over Mr. Sanders and what the respective responsibilities of the Clubs and Mile High Valet may have vis-à-vis Mr. Sanders, *e.g.*, recordkeeping or scheduling obligations.

[9] When citing to deposition transcripts, this court refers to the document number assigned by the Electronic Court Filing ("ECF") system, but the original page and line numbers of the transcript for the purposes of consistency.

on weekend nights. [#47 at 5 ¶ 14; #47-4 at 29:24–30:3, 40:25–41:7, 82:23–83:1; #51 at 6-7 ¶ 14].

10.     No one but Mr. Hamilton discussed this financial arrangement with Plaintiff and the Clubs did not receive any of the money that Mr. Sanders paid to Mr. Hamilton.[10] [#47 at 5 ¶ 15; #47-4 at 36:24-37:12 (Q: "So who told you that was the arrangement?" A: "Jimmie [Hamilton]." Q: "Anybody else tell you that?" A: "No."), 81:1-3 (Q: "Did [the Clubs] . . . receive any of the money that you paid [Mr. Hamilton]?" A: "No.")].

11.     The Clubs had no involvement in the financial arrangement between Plaintiff and Mr. Hamilton, including specifying his wage. [#47 at 5 ¶ 16; #47-4 at 37:2-12; #47-1; #51 at 8 ¶ 16].  The Clubs never paid Mr. Sanders any wages.  [#47-2 at ¶ 9; #47-3 at ¶ 9].  Nor did the Clubs and Mile High Valet specify any wage for the valet drivers. [#47-1; #47-2 at ¶ 9; #47-3 at ¶ 9].

12.     Only after meeting with Mr. Hamilton was Mr. Sanders introduced to the Clubs' employees.  [#47-4 at 28:12–29:13; #51 at 6 ¶ 13; #55 at 9 ¶ 13].

13.     Mr. Hamilton gave Plaintiff a valet driver position at PTSC and told Plaintiff that his work schedule would be Sunday and Thursday from 6:00 p.m. to 2:30 a.m., and Friday and Saturday from 5:00 p.m. to 5:00 a.m. or 6:00 a.m., depending on the night. [#47 at 5–6 ¶ 17; #47-3 at ¶ 8; #47-4 at 26:7-8, 42:23-25, 50:16-20, 99:9-1; #51 at 8 ¶ 17].

14.     Plaintiff considered Mr. Hamilton to be his boss. [#47 at 7 ¶ 22; #47-4 at 66:7-8; #51 at 10 ¶ 22].

15.     The Clubs did not formulate or maintain records for Plaintiff's work schedule. [#47

---

[10] Plaintiff denies this fact without offering evidence to support his position. *See* [#51 at 7-8 ¶ 15]. Instead, Plaintiff cites, "[i]n addition to the financial arrangement [between Plaintiff and Mr. Hamilton]," separate arrangements between Plaintiff and the Clubs wherein Plaintiff would (a) pay cash to Uber drivers to incentivize the drivers to service the Clubs, and (b) purchase ink for a printer in the valet shack—expenses for which the Clubs would reimburse Plaintiff. [*Id.* (citing [#50-1 at 73:15-25, 109:23-110:5])].  This assertion does not rebut the undisputed fact that the Clubs did not receive any of the money paid by Mr. Sanders to Mr. Hamilton.

at 6 ¶ 18; #47-4 at 139:13-15 (Q: "Do you know whether the clubs kept a log or a schedule of when the valets were working?" A: "No."), 140:9-25 (Q: "Did the club have you or any valet's schedule posted anywhere?" A: "No." Q: "How did . . . [the Clubs] know who was working each day?" A: "[The Clubs] would find out who worked when that person arrived."); #47-3 at ¶ 11 ("I set Mr. Sanders' work schedule and directed him to stay at the club until all the entertainers had left. The Club had nothing to do with setting Mr. Sanders' work schedule.")].

16.     If a valet driver shift needed to be covered at the Clubs, Mr. Hamilton (not the Clubs) would ask Plaintiff to cover the shift. [#47 at 11 ¶ 33; #47-4 at 43:12-15, 44:7-8; #47-5 at 6-8, 16; #51 at 15 ¶ 33].

17.     When he worked, Plaintiff was expected to remain on site until the last entertainer had left the premises. [#47-3 at ¶ 11; #51 at 9 ¶ 18].

18.     Mile High Valet was responsible for setting up traffic cones in the parking lot [#47 at 4 ¶ 8; #47-4 at 102:20], parking customers' cars [#47 at 4 ¶ 8; #47-4 at 26:2], maintaining customers' car keys [#47 at 4 ¶ 8; #47-4 at 111:25-112:13], retrieving customers' cars when they were ready to leave the Clubs [#47 at 4 ¶ 8; #47-4 at 73:14-15], and paying for any incidental damage to vehicles in the Clubs' lots while the vehicles were under Mile High Valet drivers' control [#47 at 4 ¶ 8; #47-2 at ¶¶ 6, 8; #47-3 at ¶¶ 6, 7].[11]

---

[11] Plaintiff denies that Mile High Valet had control over the Clubs' parking lots, arguing that the Clubs' directors "directed Plaintiff's duties regarding the parking lot, including which signs to use, where to place the signs . . . [and] cones, and where the cones and signs were stored." [#51 at 5–6 ¶ 8 (citing [#50-1 at 94:10-25, 96:3-11])]. However, as Defendant points out [#55 at 7 ¶ 8], the excerpts of Mr. Sanders's testimony cited by Plaintiff to support this contention make no mention of the Clubs directing the foregoing activities. *See* [#50-1 at 94:10-25]. And Mr. Sanders testified that Mr. Hamilton instructed him on cone placement. [#55 at 7 ¶ 9; #47-4 at 29:3-8 (Q: What sort of . . . job duties did you discuss with [Mr. Hamilton]?" A: " . . . [W]here to put cones on the parking lot[.]")]. Mr. Sanders's testimony, including in the excerpt cited by Plaintiff, states that Mr. Hamilton instructed Plaintiff on how to park the cars, *see* [#50-1 at 96:1-5 (Q: "Is there a certain way to park the cars?" A: "You back them in?" Q: "[Mr. Hamilton] told you that?" A:

19.     The Clubs determined where the cars were parked. *See* [#50-1 at 96:5-6 (Q: "A certain spot to put [cars] in?" A: "Yeah. And that came from the club.")].

20.     Mr. Hamilton instructed Plaintiff on how to park customer cars in the parking lot, [#47 at 7-8 ¶ 23; #47-4 at 95:20-96:4; #51 at 10 ¶ 23]; provided Plaintiff with tools needed to perform his valet driver duties including valet shirts and valet ticket stubs, [#47 at 8 ¶ 24; #47-4 at 46:19-47:10, 95:1-11; #51 at 11 ¶ 24]; and told Plaintiff that, because he was a valet driver and not a security guard, Plaintiff could not be inside the clubs or get involved in fights,  [#47 at 8 ¶ 25; #47-4 at 67:18-68:16; #47-5 at 13, 23; #51 at 11 ¶ 25].

21.     Plaintiff maintained "constant back and forth" communication about his job with Mr. Hamilton, not the Clubs.  [#47 at 10-11 ¶ 31; #47-4 at 111:18-23 (A: "It was constant back and forth." Q: "Between you and [Mr.] Hamilton?" A: "Yep." Q: "Not you and the club?" A: "No.")].

22.     Plaintiff would notify Mr. Hamilton when Plaintiff arrived at work. [#47 at 9 ¶ 27; #47-5 at 17, 19, 21, 24; #51 at 12 ¶ 27].

23.     Plaintiff regularly checked in with Mr. Hamilton and reported details surrounding his valet duties to Mr. Hamilton on a daily basis, [#47 at 8–9 ¶ 26; #47-4 at 85:3-9, 90:6-8; #47-5 at 9, 26, 35-37; #51 at 12 ¶ 26], and Mr. Hamilton checked in with Plaintiff on a daily basis

---

"Yeah.")]. Mr. Sanders' characterization to the contrary cannot create a genuine issue of material fact in light of his prior sworn testimony.  *See Pasternak v. Lear Petroleum Expl., Inc.*, 790 F.2d 828, 834 (10th Cir. 1986) ("Conclusory allegations, general denials, or mere argument of an opposing party's case cannot be utilized to avoid summary judgment.").  And even if Mr. Sanders had offered his own affidavit to support such assertion, it is not clear that this court would accept it as witnesses are generally not permitted to contradict their previous, clear sworn testimony without explanation. *See Allen*, 736 Fed. Appx. at 940 n.3 (10th Cir. 2019) (rejecting the plaintiff's version of events on summary judgment that contradicted the plaintiff's deposition testimony); *Hernandez v. Valley View Hosp. Ass'n*, 684 F.3d 950, 956 n.3 (10th Cir. 2012) (noting that an affidavit on summary judgment could not create a genuine issue of material fact when, without explanation, it contradicts prior testimony).

regarding Plaintiff's job performance and duties, [#47 at 9–10 ¶ 29; #47-4 at 85:11-17, 90:10-18; #47-5 at 7-10; #51 at 13–14 ¶ 29].

24.     Plaintiff reported any complaints related to his valet duties to Mr. Hamilton, not the Clubs.[12]   [#47 at 9 ¶ 28; #47-4 at 36:10-12, 111:6-20; #47-5 at 14, 27, 30, 32 (messages from Plaintiff to Mr. Hamilton about Plaintiff's pay), 13 (message from Plaintiff to Mr. Hamilton complaining about another Mile High Valet driver); #51 at 13 ¶ 28].

25.     Per the direction of Mr. Hamilton, Plaintiff would pick up waters before his shifts to give to the Clubs' employees and customers.[13] [#47-4 at 98:1-4 ("[Mr. Hamilton] only asked that we bring waters before work to give to the employees, the customers, different things like that.")].

26.     During some of his shifts, Plaintiff would use Mr. Hamilton's Uber account to call Uber drivers for the Clubs' employees and patrons. [#55 at 5-6 ¶ 7 (citing [#56-1 at 77:10-19]); #51 at 4 (citing [#50-1 at 100:12-23])].

27.     Upon his arrival to work, Plaintiff would "grab a radio from the [club] director's office." [#51 at 12 ¶ 27; #55 at 17 ¶ 27; #54-1 at 73:5-11].

28.     The Clubs provided Plaintiff with the radio as a means of communicating to Plaintiff when guests or entertainers were leaving the club.  [#47 at 7 ¶ 21; #47-2 at ¶ 7; #47-4 at

---

[12] Plaintiff denies this statement of fact but, contrary to Plaintiff's assertion, the testimony Plaintiff offers as supporting evidence does not suggest that "Plaintiff reported his frustration regarding the Uber payment arrangements to the clubs." [#51 at 13 ¶ 28 (citing [#50-1 at 100:12–101:5 ("To make it easier, I even went and bought a printer to put in the shack . . . I asked [a Clubs' employee] if I could do that.")])].

[13] Plaintiff asserts that "Defendant . . . directed Plaintiff to provide water to any intoxicated club patrons . . . ." [#51 at 4 (citing [#50-1 at 98:17–99:8]). But the cited excerpt of Mr. Sanders's deposition does not include mention of the provision of water to intoxicated customers. *See* [#51-4 at 98:17-99:8]. *Cf.* [#50-1 at 98:9–16].  Moreover, Mr. Sanders testified that the instruction to pick up waters before his shift and offer them to employees and patrons came from Mr. Hamilton. [#47-4 at 98:1-–4].

73:6–15; #51 at 10 ¶ 21; #51-1 at 38:21, 73:5–14].

29.     The Clubs determined where cars were parked in their respective lots and instructed Plaintiff accordingly.   [#51 at 5 ¶ 8 (citing [#50-1 at 96:5–6 (Q: "A certain spot to put [cars] in?" A: "Yeah. And that came from the club.")]); #55 at 7–8 ¶ 8].

30.     At the Clubs' direction, if a patron was too intoxicated to drive, Plaintiff was required to inform the patron that they could not drive home and request the patron's keys. [#51 at 4–5 ¶ 7; #50-1 at 98:17–99:8; #55 at 6 ¶ 7].

31.     If Plaintiff was a bystander to an altercation, the Clubs expected him to file police reports concerning the incident. [#51 at 11–12  ¶ 25 (citing [#50-1 at 65:4–7, 69:17–70:5, 71:12–25]); [#55 at ¶ 25 (citing [#56-1 at 126:25–127:1])].

32.     When the Clubs held a theme night, the Clubs asked Plaintiff to dress according to the '80s theme (rather than wear the valet shirt provided by Mr. Hamilton) and Plaintiff complied. [#50 at 5 ¶ 7 (citing [#50-2; #50-1 at 78:23–79:2]); #55 at 4–6 ¶ 7].

33.     On one occasion, a club director called Plaintiff into one of the Clubs to "help escort a chick who had just slapped [the club director]." [#51 at ¶ 25 (citing [#50-1 at 65:4–7, 69:17–70:5, 71:12–25]); #55 at 16 ¶ 25 (citing [#56-1 at 69:17–70:5])].

34.     In addition to his valet duties, Plaintiff passed out promotional materials for the Clubs at various locations at the direction of a club director, "to kind of keep at peace with everybody" but did not have an issue with the task.  [#47-4 at 78:6–20, 80:3-10, 106:17–22].

35.     Although he could have declined to do so, Plaintiff occasionally drove the Clubs' employees home after their shifts out of "[g]enerosity" and "[b]ecause . . . it was on [his] way." [#47-4 at 108:6–12].  *See also* [#51 at 4 ¶ 7 (citing [#50-1 at 106:16–22]); #50-1 at 106:17–19 (Q: "Were there occasions in which you gave rides to employees?" A: "Yeah.")].

36.     The Clubs tasked Plaintiff with obtaining Uber rides for the Clubs' patrons and employees on the Clubs' behalf. [#51 at ¶ 7 (citing [#50-1 at 100:12-23, 106:16–22]); #55 at 5-6 ¶ 7 (clarifying that Plaintiff used Mr. Hamilton's Uber account to obtain Uber rides for the Clubs)].

37.     In order to incentivize Uber drivers to serve the Clubs, Plaintiff was instructed to and did tip Uber drivers that provided their services to the Clubs. [#51 at ¶ 15 (citing [#50-1 at 73:15–25, 101:6-13, 113:14–20]); #55 at 10–11 ¶ 15 (citing [#56-1 at 73:15–25])].  The Clubs reimbursed Plaintiff for these Uber expenses.  [#51 at 7–8 ¶ 15 (citing [#50-1 at 73:15–25, 109:23–110:5]).

38.     Plaintiff purchased a printer for the valet shack "to try to retain [his] duties and keep [his] lot clean," [#50-1 at 110:23–25], and was never reimbursed by Mr. Hamilton, the Clubs, or otherwise, [#51 at 7–8 ¶ 15; #50-1 at 109:23–110:25], but the Clubs did reimburse Plaintiff for the ink cartridges used, [#51 at ¶ 15 (citing [#50-1 at 109:23–11:5]); #55 at 10–11 ¶ 15].

39.     In August 2017, a director at PTSC asked Plaintiff to leave and not return because Plaintiff failed to wear his valet shirt while working that evening.  [#47 at 6–7 ¶ 19; #47-4 at 46:5–7 ("I was asked to leave and not work there anymore by the club manager"); #51 at 9 ¶ 19].

40.     Subsequently, Plaintiff began working as a valet driver at MHMC, still reporting to Mr. Hamilton and Mile High Valet.  [#47 at 7 ¶ 20; #47-3 at ¶ 12; #47-5 at 7, 10–11, 16, 19, 21, 24–26, 28, 38; #51 at 9 ¶ 20].

41.     If the Clubs had questions or complaints about a valet driver, the Clubs would call Mr. Hamilton to address the issue. [#47 at 11–12 ¶ 34; #47-5 at 31; #47-4 at 104:3–105:6; #55 at 22–23 ¶ 34].

42.     In October 2018, Plaintiff obtained a second, daytime job that affected his availability on weekdays to work as a valet.  This resulted in Plaintiff's inability to work the

number of shifts Mr. Hamilton and Mile High Valet required from their valet drivers. [#47 at 12 ¶ 35; #47-3 at ¶ 14; #47-4 at 116:18–117:14; #51 at 16 ¶ 35].

43.     Accordingly, Mr. Hamilton assigned a different valet driver to Plaintiff's designated days, effectively terminating Plaintiff from his position with Mile High Valet. [#47 at 12 ¶ 36; #47-3 at ¶ 14; #47-4 at 116:18–117:14; #51 at 16 ¶ 36].

44.     The Clubs did not keep any records regarding valet drivers.[14] [#47 at 12–13 ¶ 37; #47-2 at ¶ 10 ("We did not maintain valet drivers' personnel records on the Clubs' premises."); #47-5 at 141:5-7].

## ANALYSIS

This court now turns to each of the four factors to determine whether summary judgment is warranted.

***Power to Hire and Fire.***  Defendant argues that it did not have the power to hire or fire Plaintiff because (a) Plaintiff called Mr. Hamilton to ask about the valet driver position; (b) Mr. Hamilton hired Plaintiff as a valet driver and assigned Plaintiff to work at PTSC; (c) Mr. Hamilton stopped assigning Plaintiff shifts (instead assigning Plaintiff's usual shifts to a different valet driver) when Plaintiff's availability to work decreased; and (d) Mr. Hamilton terminated Plaintiff from his position.  [#46 at 6].

In turn, Plaintiff argues that Defendant had the power to hire him because, when Plaintiff met with Mr. Hamilton to discuss the position, he was also introduced to the club director of PTSC

---

[14] Plaintiff challenges this assertion but fails to provide any supporting evidence that valet driver records were kept by the Clubs. *See* [#51 at 17 ¶ 37 (citing [#50-1 at 139:20–140:8 (Q: "What were you writing down?" A: "The amount of Ubers that were dropped off, . . . which we would turn in." . . . Q: "So the club may have kept those records." A: "Yep.")])]. Plaintiff's unsubstantiated speculation that the Clubs *may* have kept records is insufficient evidence to create a dispute of fact. *See supra* n.6.

and several PTSC employees. [#49 at 6].  Notwithstanding Plaintiff's introduction to the Clubs' employees, however, it is undisputed that Mr. Hamilton "contracted with Jonathan Sanders, as well as other individuals, to work as valet drivers for Mile High [Valet].  The Clubs had nothing to do with Mile High [Valet] retaining Mr. Sanders." [#47-3 at ¶ 8].

Defendant contends that Plaintiff was never fired from his position at PTSC and points out that Plaintiff continued his employment as a valet driver at MHMC.  [#46 at 6–7].  Plaintiff responds that the Clubs did have the power to fire him because, in 2017, a club director at PTSC sent Plaintiff off the premises for failure to wear a valet shirt to his shift. [#49 at 5].  According to Plaintiff, he was "forbidden to return" to PTSC.  [*Id.*].  On this basis, claims Plaintiff, "the Clubs demonstrated that they could effectively terminate Plaintiff's employment by expressing dissatisfaction with his performance and asking him to leave and *not return*." [*Id.* at 6 (emphasis in original)].

But Plaintiff's removal from PTSC and subsequent transition to MHMC are not tantamount to a termination and rehiring. "[Defendant] lacked the power to fire [Plaintiff]; it at most could request that [Mile High Valet] no longer assign [Plaintiff] to work at [the Clubs]."  *See Knitter v. Corvias Military Living, LLC*, 758 F.3d 1214, 1229 (10th Cir. 2014) (affirming summary judgment and finding that the defendant was not a joint employer).  Indeed, the undisputed evidence shows that Plaintiff was employed as a valet driver from the time Mr. Hamilton offered him the position (in 2016) to the time Mr. Hamilton terminated Plaintiff (in 2018), notwithstanding Plaintiff's removal from PTSC in 2017.  *See* [Undisputed Material Facts ("UMF") ¶¶ 6, 13, 39, 40, 42, 43]. These undisputed facts are analogous to the DOL's example set forth in its regulation:

> (4)(i) Example. A restaurant contracts with a cleaning company to provide cleaning services. The contract does not give the restaurant authority to hire or fire the cleaning company's employees or to supervise their work on the restaurant's premises. A restaurant official provides general instructions to the team leader from

the cleaning company regarding the tasks that need to be completed each workday, monitors the performance of the company's work, and keeps records tracking the cleaning company's completed assignments. The team leader from the cleaning company provides detailed supervision. *At the restaurant's request, the cleaning company decides to terminate an individual worker for failure to follow the restaurant's instructions regarding customer safety.* Is the restaurant a joint employer of the cleaning company's employees?

(ii) Application. Under these facts, the restaurant is not a joint employer of the cleaning company's employees because the restaurant does not exercise significant direct or indirect control over the terms and conditions of their employment. The restaurant's daily instructions and monitoring of the cleaning work is limited and does not demonstrate that the restaurant is a joint employer. Records of the cleaning team's work are not employment records under paragraph (a)(1)(iv) of this section, and therefore, are not relevant in determining joint employer status. *While the restaurant requested the termination of a cleaning company employee for not following safety instructions, the decision to terminate was made voluntarily by the cleaning company and therefore is not indicative of indirect control.*

29 C.F.R. § 791.2(g)(4)(i) (emphasis added).

Here, the undisputed fact is that Mr. Sanders was not terminated from Mile High Valet. Indeed, he was moved to another location owned by the Clubs. [UMF ¶¶ 39, 40]. Accordingly, there is "no genuine dispute that control over the most important condition of [Plaintiff]'s employment under the joint employer test—the ability to terminate [his] employment—lay solely with [Mile High Valet]. [Glendale] did not share in this power as a joint employer." *See Knitter*, 758 F.3d at 1229. *See also Zinn v. McKune*, 143 F.3d 1353, 1358 (10th Cir. 1998) (affirming summary judgment and noting that "[t]hough the [defendant] retains the right to request removal of [the contractor's] personnel with whom it is dissatisfied, and did so in this case, [the contractor] alone exercises control over the hiring and firing of [the contractor's] personnel"); *Palage v. HCA-HealthONE, LLC*, 2012 WL 5493998, at *6 (D. Colo. Nov. 13, 2012) (granting summary judgment and finding that "[a]lthough [the defendant] did have the contractual ability to request the re-

assignment of [the contractor's] employee assigned to its facilities, this does not equate to either hiring or firing [the contractor's] employees").

 ***Supervision and Control of Employee Schedules and/or Conditions of Employment.*** Defendant argues that Mr. Hamilton, and not the Clubs, supervised and controlled Plaintiff's work schedule and conditions of employment. [#46 at 7, 8]. Specifically, Defendant argues that "the essential parts of Plaintiff's job as a valet driver," including his work schedule, job duties and performance thereof, uniform, and communications, were all "controlled by, reported to, or facilitated by [Mr.] Hamilton, not the Clubs." [#56 at 6]. In Response, Plaintiff argues that the Defendant controlled the conditions of his employment because the Clubs "controlled almost every aspect of Plaintiff's day-to-day job duties once he arrived at the Club." [#49 at 7]. In Reply, Defendant characterizes any control exerted by the Clubs as control typical of vendor-client relationships and routinely found insufficient for joint-employer purposes. [#56 at 7 (citing *Knitter*, 758 F.3d at 1230; *Banks v. St. Francis Health Ctr., Inc.*, 2016 WL 6905581 (D. Kan. Nov. 21, 2016))].

 <u>Work Schedule.</u> The undisputed evidence shows that Mr. Hamilton, not the Clubs, supervised and controlled Plaintiff's work schedule. [UMF ¶¶ 13, 15, 16]. And if a valet shift at the Clubs needed coverage, Mr. Hamilton—not the Clubs—would ask Plaintiff to cover the shift. [*Id.* at ¶ 16]. Moreover, the Clubs did not provide the requisite valet shirts to Plaintiff—Mr. Hamilton did. [*Id.* at ¶ 4]. Plaintiff communicated with Mr. Hamilton regularly to tell Mr. Hamilton when he arrived to work or if he was running late to a shift. [*Id.* at ¶¶ 21–23]. In turn, Mr. Hamilton would check in on Plaintiff regularly to ensure Plaintiff was working. [*Id.* at ¶ 23]. No one from the Clubs checked in on Plaintiff in this manner. [*Id.* at ¶ 21].

 <u>Control of Operations.</u> While the court recognizes that control of operations is not

necessarily proof of control over conditions of employment, it is also undisputed that Mile High Valet generally controlled operations of the Clubs' parking lots.  Mile High Valet was responsible for setting up traffic cones in the parking lot, parking customers' cars, maintaining customers' car keys, retrieving customers' cars when they were ready to leave the Clubs, and paying for any incidental damage to vehicles in the Clubs' lots while the vehicles were under Mile High Valet drivers' control.  [*Id.* at ¶ 18].  And Mr. Hamilton exerted his control over the parking lot and his valet drivers: he instructed Plaintiff on how to park cars in the parking lots; provided Plaintiff with tools needed to perform his valet driver duties, including valet shirts and valet ticket stubs; directed Plaintiff to pick up waters before his shifts to give to the Clubs' patrons and employees; and told Plaintiff that, because he was a valet driver and not a security guard, Plaintiff could not be inside the clubs or get involved in fights. [*Id.* at ¶¶ 18, 20].

And although Plaintiff performed a variety of tasks for the benefit of the Clubs and beyond the scope of his valet duties, including occasionally driving the Clubs' employees home; passing out promotional flyers at other locations; escorting entertainers from the building to their cars; and shopping for groceries for the Clubs' staff events, he testified that he believed he could have declined to do such tasks but had no issue with them and did so out of "[g]enerosity" and "to kind of keep at peace with everybody."  [*Id.* at ¶¶ 34, 35].  Performing favors, particularly where an employee believes he could have declined to acquiesce, is not the same as acting under mandatory instruction.   *See, e.g.*, *In re Enterprise Rent-A-Car Wage & Hour Employ. Practices Litig.*, 683 F.3d 462, 470 (3rd Cir. 2012) (affirming summary judgment and declining to find that the defendant had sufficient control to be a joint employer, in part, because the record did "not support the plaintiffs' claims that [the putative joint employer]'s recommendations were anything more than recommendations," and concluding that "the plaintiffs produced no evidence that [the putative

joint employer]'s actions at any time amounted to mandatory directions rather than mere recommendations."); *State of New York et al v. Scalia et al*, No. 1:20–cv–1689–GHM, 2020 WL 5370871, at *5 (S.D.N.Y. Sept. 8, 2020) (distinguishing a "potential joint employer's request, recommendation, or suggestion" from "control"); 85 Fed. Reg. 2820, 2835 (Jan. 16, 2020), codified at 29 C.F.R. §§ 791.1-3 ("[A] voluntary decision to grant the potential joint employer's request, recommendation, or suggestion does not constitute . . . control that may demonstrate joint employer status.").

Yet the undisputed facts also demonstrate that the Clubs did furnish Plaintiff with a radio, which he was expected to wear for the duration of his shift. [UMF ¶¶ 27, 28]. In addition, Plaintiff had to follow rules imposed by the Clubs—namely, that he "listen to [his] radio, be available on the radio, [and] be able to respond." [#49 at 7; #50-1 at 73:5–15, 146:17–21]. The Clubs controlled where cars were parked in their respective lots; directed Plaintiff to inform intoxicated patrons that they could not drive home and request their car keys; expected Plaintiff to file police reports if he was a bystander to an event; required Plaintiff to incentivize Uber drivers with cash tips; communicated over radio to Plaintiff when a patron or entertainer was preparing to leave the premises to facilitate Plaintiff's prompt retrieval of the appropriate vehicle; and asked Plaintiff to escort an entertainer from the premises after she slapped a club director. [*Id.* at ¶¶ 28–33]. And it is disputed who required Mr. Sanders to remain on-site until the last entertainer left, Mile High Valet and Mr. Hamilton or the Clubs. *Compare* [#50-1 at 65:23–66:6] *with* [#47-3 at ¶ 11].

Defendant argues that even if the foregoing facts are taken as true, these facts merely demonstrate an average vendor-client relationship and are incidental to workplace safety, satisfactory performance of the tasks the Clubs' hired Mile High Valet to perform, and Mile High Valet's contractual obligation under the Valet Parking Agreements. [#56 at 11]. Though this court

respectfully disagrees and construes all ambiguity in favor of Mr. Sanders,[15] guided by the DOL

regulation, it finds these facts are still insufficient to create a genuine issue of material fact as to

the supervision and control of Mr. Sanders' employment:

> (4)(i) Example. A restaurant contracts with a cleaning company to provide cleaning services. The contract does not give the restaurant authority to hire or fire the cleaning company's employees or to supervise their work on the restaurant's premises. *A restaurant official provides general instructions to the team leader from the cleaning company regarding the tasks that need to be completed each workday, monitors the performance of the company's work, and keeps records tracking the cleaning company's completed assignments*. The team leader from the cleaning company provides detailed supervision. At the restaurant's request, the cleaning company decides to terminate an individual worker for failure to follow the restaurant's instructions regarding customer safety. Is the restaurant a joint employer of the cleaning company's employees?

> (ii) Application. *Under these facts, the restaurant is not a joint employer of the cleaning company's employees because the restaurant does not exercise significant direct or indirect control over the terms and conditions of their employment. The restaurant's daily instructions and monitoring of the cleaning work is limited and does not demonstrate that the restaurant is a joint employer. Records of the cleaning team's work are not employment records under paragraph (a)(1)(iv) of this section, and therefore, are not relevant in determining joint employer status.* While the restaurant requested the termination of a cleaning company employee for not following safety instructions, the decision to terminate was made voluntarily by the cleaning company and therefore is not indicative of indirect control.

29 C.F.R. § 791.2(g)(4)(i) (emphasis added).

> ***Determination of Rate and Method of Payment.*** Plaintiff argues that the Clubs determined

his rate of pay because the Parties had an arrangement wherein the Clubs reimbursed Plaintiff for

his expenditures made on the Clubs' behalf.  [#49 at 10].  Specifically, Plaintiff "was required to

---

[15] By way of example, retrieving an entertainer from inside the club and escorting her out at the direction of a club director was neither incidental to workplace safety of the parking lots, satisfactory performance of valet duties, nor Mile High Valet's contractual obligation to the Clubs.

order Uber transportation on behalf of both customers and employees,"[16] and "to tip Uber drivers to make the drivers more amenable to providing their services to the Club[s]." [*Id.* (citing [#50-1 at 101:6–13, 113:14–20, 76:19–22].   Plaintiff also "purchased a printer to make the Uber arrangement more efficient, and the Club reimbursed Plaintiff for the ink cartridges used." [#49 at 11; UMF ¶ 38].

At the outset, the court notes that there is a question whether reimbursements are contemplated by the economic realities test's third factor.  Defendant is the only party to explicitly address whether reimbursement of expenses qualifies as payment, [#56 at 12], and argues that courts look to payment of wages, compensation, salary or wages, wage rates, and/or frequency of pay to determine whether a putative joint employer determined an individual's rate and method of payment. [*Id.* (citing *Coldwell v. RiteCorp Envtl. Prop. Sols.,* No. 16–cv–01998–NYW, 2017 U.S. Dist. LEXIS 68252, at *20, 2017 WL 1737715 (D. Colo. May 4, 2017) (referring to the rate and method of payment as "payment of wages," "compensation," and "salary or wages"); *Zevallos v. Stamatakis,* No. 2:17–cv–00253–DN, 2017 U.S. Dist. LEXIS 201961, at *13, 2017 WL 6060623 (D. Utah, Dec. 6, 2017) (referring to the rate and method of payment as "wage rates" and "frequency of pay"))].   However, the court is unpersuaded by the authority cited by Defendant because it does not expressly address whether reimbursements are part of the foregoing considerations.

Instead, the court's analysis is guided by the FLSA and DOL's treatment of reimbursements in calculating an employee's regular rate of pay.  For overtime compensation

---

[16] To the extent Plaintiff claims that he used "his personal Uber account" to summon Uber rides on the Clubs' behalf, [#49 at 10 (citing [#50-1 at 76:10–22])], this contention is contradicted by Plaintiff's deposition testimony, *see* [#55 at 5–6 ¶ 7; #56-1 at 77:13–17 (Plaintiff clarifying that he used Mr. Hamilton's Uber account, not his personal Uber account)].

purposes, the FLSA defines an employee's "regular rate" to include "reasonable payments for . . . expenses[] incurred by an employee in the furtherance of his employer's interests and properly reimbursable by the employer[.]" 29 U.S.C. § 207(e)(2).  But the DOL regulations further explain that,

> [w]hen an employee incurs expenses on his employer's behalf or where he is required to expend sums by reason of action taken for the convenience of his employer, section 7(e)(2) is applicable to reimbursement for such expenses. Payments made by the employer to cover such expenses are *not included* in the employee's regular rate (if the amount of the reimbursement reasonably approximates the expense incurred).

29 C.F.R. § 778.217 (emphasis added).  In other words, reimbursements like those made by the Clubs to Plaintiff are not the same as Plaintiff's rate of payment.  *See Seeman v. PJMP, LLC*, No. 16 C 8817, 2017 WL 3311039, at *9 (N.D. Ill. Aug. 3, 2017) (in the context of a Title VII action, considering whether the defendant was a joint employer and finding that the answer to "whether the putative employer was responsible for providing payment or benefits to the putative employee[] disfavor[ed] a finding of employer status because," except for "some out-of-pocket reimbursements, [the putative employer] paid [the plaintiff] no compensation").  *But see Perry v. Pediatric Inpatient Critical Care Servs., P.A.*, SA-18-CV-404-XR, 2020 WL 1248263, at *17 (W.D. Tex. Mar. 16, 2020) (applying two-part economic realities/control inquiry to determine joint employer status in Title VII context and concluding that "the economic realities weigh[ed] in favor of finding the [defendant] was not an employer; it did not pay Plaintiff's salary . . . or reimburse expenses, nor did it set the specific terms and conditions of Plaintiff's employment." (emphasis added)).

Notwithstanding the Clubs' reimbursement arrangement with Plaintiff, the fact remains that Plaintiff reached agreement with Mr. Hamilton regarding Plaintiff's compensation as a valet driver. [UMF ¶¶ 9–11].  Moreover, the undisputed evidence shows that Plaintiff went to Mr.

Hamilton with complaints about his compensation. [*Id.* at ¶ 24].  In contrast, there is no evidence—other than Mr. Sanders's testimony that he complained to the Clubs' employees when business was slow—that Plaintiff directed complaints about his pay to the Clubs.  Indeed, Plaintiff concedes that, "while [Mr.] Hamilton dictated Plaintiff's arrangement for receiving and keeping tips,"—which comprised Plaintiff's compensation for his valet position—"Defendant dictated Plaintiff's arrangement for reimbursement without input from [Mr.] Hamilton." [#49 at 11].  Given the FLSA and DOL's recognition of the distinction between reimbursements and an employee's rate of pay, I find Plaintiff's reimbursement arrangement with the Clubs inapposite to the instant inquiry.

***Maintenance of Employment Records***.  In an attempt to demonstrate a dispute of fact challenging Defendant's evidence that the Clubs did not maintain personnel files on Mile High Valet drivers, Plaintiff points to Mr. Sanders's testimony that the Clubs "may" have kept sheets of paper Plaintiff used to "tally" his "tab of Uber expenses" in order to receive reimbursement from the Clubs at the end of his shifts. [#49 at 11 (citing [#50-1 at 139:24–140:6]); #50-1 at 76:19–77:5; UMF ¶ 44].  Plaintiff cites no authority that these "tallies" would be the type of employment records contemplated by the FLSA.  *See* 29 C.F.R. § 729.1(g)(4)(i).  But even if these papers constitute the kinds of employment records contemplated by the joint-employer test, there is simply no evidence that the Clubs kept Plaintiff's papers, in a personnel file or otherwise.  Plaintiff's unsubstantiated speculation that the Clubs "may" have kept these papers is insufficient to create a dispute of fact on the issue.  Indeed, it is clear that neither the Clubs nor Mile High Valet provided Mr. Sanders with W-2 tax statements.  [#47-4 at 30:4–8].

## CONCLUSION

In applying the four-factor economic realities test (and the factors relevant to the joint employer inquiry) to the undisputed material facts in the record, this court concludes after

considering each of the four factors that, notwithstanding the broad remedial nature of the statute, there is no genuine issue of material fact to warrant a trial in this matter.  Specifically, I find that (1) Glendale has met its burden of establishing that there is no genuine dispute of material fact as to Glendale's status as a joint employer—and thus the applicability of the FLSA to Glendale—and (2) Mr. Sanders has failed to set forth specific facts establishing an issue most properly reserved for trial.  Accordingly, Defendant's Motion for Summary Judgment is granted.

For the reasons stated herein, **IT IS ORDERED** that:

(1)     Defendant's Motion for Summary Judgment [#46] is **GRANTED**;

(2)     Summary judgment shall enter in **FAVOR** of Glendale and **AGAINST** Plaintiff, and Mr. Sanders's claims are **DISMISSED with prejudice**;

(3)     Final Judgment shall enter in **FAVOR** of Glendale and **AGAINST** Mr. Sanders;

(4)     Defendant, as the prevailing party, shall be awarded its costs pursuant to Rule 54(d)(1) of the Federal Rules of Civil Procedure and D.C.COLO.LCivR 54.1;

(5)     The three-day bench trial set to commence on **October 26, 2020** is **VACATED**; and

(6)     The Clerk of the Court shall **TERMINATE** this matter accordingly.

DATED:  September 17, 2020                    BY THE COURT:

                                                            Nina Y. Wang
                                                            United States Magistrate Judge